HARRY BERNSTEIN, Appellee, v. WESTERN UNION TELEGRAPH COMPANY, Appellant.

**TELEGRAPHS AND TELEPHONES:** Failure to Deliver Message—
1 **Damages—Nature of Action—Contract or Tort.** An action for damages for negligent failure to deliver a telegraph message may sound in contract or tort.

**TELEGRAPHS AND TELEPHONES:** Failure to Deliver Message—
2 **Nature of Action—Negligence—Tort—Pleading.** The action under the pleading in instant case charging gross and excessive carelessness and negligence in failing to deliver a message construed as sounding in tort.

**DAMAGES:**  Ex Contractu—Ex Delicto—Distinction—Contemplated
3   Damages—Proximate Results—Telegraphs and Telephones.

1.  Damages *ex contractu* must be (a) proximate and (b) such as were reasonably within the contemplation of the parties, etc.

2.  Damages *ex delicto* need only be proximate.

Rule No. 2 is not changed by Sec. 2163, Code, in relation to liability of telegraph companies for negligence in delivering messages.

PRINCIPLE APPLIED:  (a) Action for damages for a failure of defendant to deliver to a husband the following message sent by his wife, dated July 18, 1911:  ''Am sick. Come if you can. Wire if coming.''  Her child was born near 11:30 P. M. of July 18th, at which time she had attendants. Had the message been properly delivered the husband would have been with his wife by 7:00 A. M. of July 19th. The husband not coming, she arose from her bed near 10:00 A. M., called a boy and sent him for food for two of her other children, which act of being upon her feet in her then condition resulted in injury. During the afternoon, at least three people were with her, attending to her wants and offering farther assistance. Without requesting these attendants to perform the labor for her, she arose and swept the floor and washed her other children, with serious results to her physical well being.  *Held* that, in view of the record evidence, this last act was unnecessary and her resulting injuries therefrom were not the proximate result of the failure to deliver the message.

(b) The husband arrived home July 21st. On or about July 25th, the wife arose from her bed and proceeded thereafter to perform her household duties. On August 1st following, she took her three children and unattended, traveled from Chicago to Cedar Rapids. The evidence showed it was detrimental to a woman's health for her to arise from her bed, after confinement, in less than ten days, and that the trip to Cedar Rapids would likewise be a factor detrimental to her health. The evidence tended to show a permanent displacement of the womb, not discovered, however, until nine months after the birth of the child. *Held*, under this record, that the failure to deliver the telegram was not the proximate cause of the displacement of the womb.

**DAMAGES:**  Avoidable Consequences—Torts—Telegraphs and Tele-
4   phones—Failure to Deliver Message—Damages to Health.  The doctrine of ''avoidable consequences'' has application to actions *ex delicto* as well as *ex contractu*.

PRINCIPLE APPLIED:  (See outline facts above.)  *Held*, the court should have explained to the jury what ''necessity''

would have justified the wife in arising from her bed on the day following the birth of her child and what duty rested upon her to care for herself and thereby avoid unnecessary damages.

*Appeal from Linn District Court.*—HON. W. N. TREICHLER, Judge.

WEDNESDAY, FEBRUARY 17, 1915.

ACTION to recover damages for a failure to deliver a telegram. Opinion states the facts. Verdict and judgment for the plaintiff. Defendant appeals.—*Reversed.*

*Rickel & Dennis,* for appellee.

*Dawley & Wheeler,* for appellant.

GAYNOR, J.—This is an action to recover damages for a failure to deliver the following telegram:

Dated                    CK.Chicago, Ill., July 18th, 1911.
To   Harry Bernstein,
       Care Republican and Times,
            Cedar Rapids, Iowa.
       Am sick. Come if you can. Wire if coming.
                          Beatrice.          3.13 P.M.

It is claimed that on the 18th day of July, 1911, Beatrice Bernstein, the wife of the plaintiff, prepared and sent this telegram to her husband at Cedar Rapids, Iowa; that the charges for sending the telegram were prepaid by her; that the defendant carelessly and negligently failed to forward and deliver the message as requested and directed; that it was guilty of gross and excessive carelessness and negligence in failing to so do; that Harry Bernstein named in the telegram was in the employ of the Republican and Times, at Cedar Rapids, and that if said message had been forwarded

with ordinary care and promptness, plaintiff would have received the same.

It is further claimed by the plaintiff that, at the time of sending said message, the said Beatrice, his wife, was threatened with immediate confinement, and that it was a matter of importance that the telegram be forwarded and delivered promptly to him; that on the same day on which the message was delivered to be sent, she was confined and gave birth to a child; that she was left without any care or anyone to look after her; that she was expecting every moment that her husband would arrive in response to the telegram; that the telegram not having been delivered, he did not reach her in time to furnish her assistance, and was unable to do so until about the 20th or 21st of July; that by reason of the failure to deliver said telegram, the said Beatrice suffered great physical pain and mental anguish, and her life was in danger; that she had two small children in the house with her, with no one to look after her or assist her; that her claim for damages, resulting from a failure to deliver said telegram, has been assigned to this plaintiff, her husband; that the plaintiff did not arrive in Chicago until the 21st day of July, 1911. Wherefore plaintiff asks judgment for $2,000.00.

Defendant's answer is a general denial.

Upon the issues thus tendered, the cause was tried to a jury, and a verdict rendered for the plaintiff. Judgment having been entered upon this verdict, defendant appeals.

It appears that at the time the telegram was sent, to wit, July 18, 1911, plaintiff's wife resided at 1217 West Adams St., Chicago; that the plaintiff, her husband, was then in Cedar Rapids, Iowa; that the plaintiff had been in Cedar Rapids about six or eight weeks at this time, working on the Times Republican as street advertiser for the newspaper. It appears that some arrangement had been made between the plaintiff and his wife, in contemplation of her confinement, that she was to send him a telegram as soon as she knew she was going to be confined, and that he was to make arrange-

ments for somebody to be with her.  It appears that on the afternoon of the day of her confinement, she talked with a physician for the purpose of ascertaining when the child would be born.  Thereafter, she went around the corner about a block and a half from her place, and telephoned the doctor and told him the condition she felt herself to be in, and told him to call as soon as he could at the house.  The doctor came about half past eight, made an examination and said there wouldn't be a birth until morning.  Then she immediately wrote the telegram in controversy to her husband, and asked him to come, as therein stated, and after writing it, she gave it to a little boy who lived downstairs in the basement, and told him to take it to the Western Union Telegraph office, which was accordingly done; that the baby was born at 11.30 that night; that she got no response to her telegram, and her husband did not come..  When she talked with the doctor at half past eight, the doctor told her it might come before morning, but he could not tell just how soon; that if her husband had received the telegram he could have arrived at seven o'clock on the morning of the 19th; that at the time the baby was born, the doctor and a Mrs. Eaton, who lived in the basement, were present.

Then in response to questions asked her by her counsel, she detailed the condition that her bed was in on the morning of the 19th at seven o'clock, as follows:

Q. "Now tell the jury what condition that bed was in the next morning at seven o'clock."

A. "Well, the bed was all soiled from top to bottom, and we were both, me and my baby, in a terrible condition at the time."

Q. "Tell the jury what your condition was and how you felt from seven o'clock and onward.  Tell the jury what your condition was, and how you felt there in the bed as it then was."

A. "Well, I felt terrible. There was no way for me to move."

Q. "Tell the jury what the condition of your night clothes was, whether or not they were soaked with blood."

A. "Yes, sir. My night clothes were all soaked with blood, and the bed and sheets were all soaked all the way through."

Q. "That was from seven o'clock onward, (meaning seven o'clock on the morning of the 19th following the birth of the child)."

A. "I was in that way until noon in the same bed. I expected my husband about seven o'clock in the morning and I waited until ten and he didn't come, and I had to crawl out of the bed and crawl to the window and call out the window to the little boy, Mrs. Eaton's boy, and he came, and I sent him to the store to get some rolls and milk to feed the two children."

Q. "Tell the jury about the children—whether they needed attention that afternoon or not."

A. "They were crying for breakfast and were not dressed, and I called for the boy to get the rolls and milk and I, sat up in bed and fed them. They didn't get washed that morning."

Q. "Tell the jury how you felt after you got up and called the boy and went back to bed."

A. "I felt bad. I felt as though things were running away from me, and I fell back in bed."

Q. "Tell the jury whether or not it was easy for you to go to the window and back again."

A. "It was all I could do to drag myself to the window and get back again, and it started me to flowing and it got real heavy and I couldn't hardly stand it."

Then she was asked the question: "The fact that your husband was not with you—tell the jury what effect that had upon you, both mentally and physically."

A. "Of course I felt bad and worried to think that I was there and he wasn't there."

Q. "How about crying and grieving for your husband?"

A. "I had been crying all the morning."

All these questions were objected to as immaterial, irrelevant, and incompetent, and objections were overruled.

She then stated that when the little boy came back from the store, she sent for the woman that did the washing; that the woman came about noon, and she asked her if she would mind taking the bed clothing and washing it and changing the bed. She took and changed the bed and took the soiled clothing and took it home. She was there until one o'clock, and from that time on, I was most of the time alone. In the afternoon, Mrs. Eaton came up and sat with me. She couldn't do much. She had a little baby of her own.

Q. "State whether you had to go to the toilet room from seven o'clock in the morning until evening, a great many times."

A. "Yes, sir. I had to get out of bed each time and go to the toilet room. That was a great many times. The toilet room was about eight or ten feet from my bed."

Q. "After you got back from your trips to the toilet room, tell the jury how you felt."

A. "Each time I stood on my feet it started the hemorrhage, and I felt bad every time I got out of bed."

Q. "Was there anyone there to look after you or your bedding or anything? Was there anyone to attend you after seven o'clock in the morning until evening?"

A. "No."

Q. "Had you in the afternoon to get up for anything or any purpose aside from going to the toilet room?"

A. "The children had been there all day, and towards evening the room got in such a terrible condition I could not stand it, and I got up and swept it. Then I got a pan and washed the children's faces and hands and put them to bed. I felt very weak after doing that. I couldn't raise my head

up then for a few minutes. Had to lie down. Each time I got up, the hemorrhage was as before but not so much as the other times."

All these questions were objected to for the same reason as before.

The witness then stated: "I had a nurse engaged from the Visiting Nurses Association, and I asked the doctor to telephone that night for her, and he said it wasn't necessary for him to do it. My husband would do it when he came. I did not telephone. No one came, and I had the boy telephone and she couldn't come until afternoon. This was on the afternoon of the 19th, and after the boy got back with the lunch for the children. I had the boy phone for the nurse the same time he phoned for the washerwoman. The nurse said she couldn't come then. She came in the afternoon, but didn't do anything for me. The washerwoman had changed my bed and bed clothing when the nurse came. The visiting nurse said she would come the next morning and take care of the child and myself. It was before the visiting nurse came that I got up and washed the children and swept the floor. The nurse came the next morning at eight o'clock. She stayed long enough to wash the baby and change my bed. We had made arrangements for the nurse to come in the winter. I wasn't expecting the nurse until after the baby was born. I sent word to the nurse that the baby was born on the morning of the 19th."

On cross-examination she said: "The nurse came about four o'clock and stayed only a few minutes. There wasn't much done. She stayed only a few minutes. The washerwoman had changed the bed. I swept the room after the nurse came there. The nurse doesn't do such things as sweeping. These nurses do their work for charity, not for pay. These nurses work from eight until five. On the morning of the 20th, she came about eight o'clock and stayed about an hour. She just washed the baby and changed my bed. She

came again on the 21st about eight o'clock. My husband was then there. He got there about seven o'clock on the morning of the 21st, and stayed until the 25th. The nurse came every morning about eight o'clock, took care of the baby until the baby was eight days old. My husband went back to Cedar Rapids when the baby was eight days old. I was up and around when my husband left. He left when the baby was eight days old. I remained out of bed after he left. I was so my husband could leave me, and he left me on the 25th, and the nurse was not required, and did not come any more after that time. From that time on, I did what work there was to be done. I left Chicago the 1st of August. The baby was then two weeks old, and I came to Cedar Rapids and have been there ever since. I came alone and my husband did not come in to meet me. I wrote a letter to my husband on the morning of the 19th and Mrs. Eaton mailed it for me. It was sent by special delivery. On the night of the 19th, I sent another telegram to my husband. On the same evening, I got an answer to this message from my husband. I sent a telegram back when the boy delivered the message.''

The plaintiff testified that he had some arrangement with his wife to let him know when she was likely to be confined; that he visited the telegraph office on the evening of the 18th until two o'clock of the morning of the 19th; that his work was done at night. ''I told the officer in charge of the office that I was expecting a telegram. I said that in case he got a telegram to rush it to me at the Times Republican. On the 27th I got a duplicate of the telegram sent on the 18th. It was handed me by the clerk in charge of the defendant's office. The first I heard that my wife was sick was on the evening of the 19th. That evening I took the newsboys to the Air Dome. It was after I got the boys seated that I got the telegram. I think it was about 8:30 or 8:20. I didn't receive any letters or telegrams or cards.''

He testified further: ''The physical condition of my wife isn't very well since that time. I took her to a doctor

at Cedar Rapids. I see a little change. I see that she isn't feeling right as she always has been before she gave birth to the child. She can't walk the street but what she complains. She walks on rocks, and she is crying. She was a woman of good health. She complains that something dropped on her below the abdomen.''

Thereupon the doctor was called who made the examination testified to by the plaintiff. He testified: ''I made the examination yesterday. She came to my office. I have found the woman not in a normal condition. I made the usual and ordinary examination to find out what the trouble was. The patient is a fleshy woman. The muscles of the abdomen are more or less relaxed. That is not good tone. The womb is displaced backward, and is lower down than it should be.''

He was asked this question: ''In what way does that affect the womb, the physical displacement of the womb such as you find in Mrs. Bernstein?''

A. ''My judgment would be that a case similar to hers, if properly treated for a period of time, good results would follow. I think it is a condition that could be greatly improved by treatment. My judgment is, that by long treatment she would be greatly improved but I don't think she would be perfectly well.''

He was then asked the following hypothetical questions:

''Assuming that Mrs. Bernstein gave birth to a child about 11:30 on the night of July 18, 1911, and assuming that the doctor who attended her left about twelve o'clock, or a short time after the child was born, that the doctor changed the sheet under Mrs. Bernstein before he left; assuming further that Mrs. Bernstein from the time that she gave birth to the child and after the doctor left and up to about ten o'clock on the next day, bled quite profusely, and that about ten o'clock the next day, she got out of bed and walked or crawled to a window close by, got up on her feet and called to a boy and went back to bed again and after she got in bed she felt quite sick and faint, more so than before she got out

of bed; and assuming that on the evening of the next day, the 19th of July, she walked to a toilet room close by, then opened it and went back to bed and bled quite profusely, that she bled further after she come from the toilet room and got back to bed, assuming all those things to be true, and assuming further that she had given birth to two children and after their birth had never been troubled with any female complaint or womb trouble, and that on the examination made by you yesterday you found her womb displaced and the cords supporting the womb in disorder and more or less stretched, and assuming that afterward from about eight days after she gave birth to this child, she had been troubled more or less with female trouble, what would you say in your opinion was the cause that brought about the condition of her womb that you found yesterday?''

A. ''My answer would be this, my judgment would be that it was her getting up out of bed immediately following the delivery of the child.''

Q. ''Tell the jury what happens, how it affects the womb when a woman gets out of bed the next day after giving birth to a child.''

A. ''Well, at the time of childbirth of course the womb is enlarged to the greatest size possible, and as a result of that increase in size, there is an increase in weight, and if at that time a woman gets out of bed the weight is more and the strain of labor more, and she is liable to produce on herself a permanent injury from that condition, because of the increased weight of the womb and the relaxed condition of the cords.''

Q. ''Assuming, as I stated to you in the hypothetical question, she had to get up several times the next day after giving birth to this child, and go to the toilet room and several other places, what would you say as to her getting upon her feet, in what way would that cause hemorrhage to take place, if you know?''

A. ''A woman who would get on her feet the following

day after labor would be subject to hemorrhage because the blood vessels have not completely contracted, the muscles have not had sufficient time to contract and as a result, the blood vessels are liable to ooze and she would be subject to hemorrhage.''

The doctor on cross-examination testified that if a woman gets up earlier than ten days after the birth, it is liable to be injurious to the average woman; that getting up earlier than that is getting up too soon, and would be apt to increase the difficulties that he found existing. ''If she got up and stayed up after the baby was eight days old, and when the baby was two weeks old traveled with three children from Chicago to Cedar Rapids, it would have an effect on her system, and I would not be able to state how much of her present condition is due to what she did immediately after the baby was born and what she did after the baby was eight days old.''

Harry Bernstein, the plaintiff, being recalled stated: ''I would have gone to my wife immediately if I had received the telegram first sent. I could have reached there by seven o'clock on the morning of the 19th. I did not arrive in Chicago in response to that telegram I received until seven o'clock on the 21st. I answered the telegram, however, and told her that I couldn't be home until the next evening. That would be the evening of the 20th. I did not, however, leave Cedar Rapids until the night of the 20th.''

Mrs. Anna Eaton, called on behalf of the defendant, testified that she lived in the same building with plaintiff's wife; that she had the basement flat; that she was acquainted with her six weeks before the baby was born; that on the evening before the baby was born, between seven and half past seven, Mrs. Bernstein came to her rooms and told her that she thought she would be sick; that she thereafter telephoned for the doctor; that she, Mrs. Eaton, went back home with her and stayed until after the doctor had left, and until after the baby was born. ''My son took a telegram to the office

for her.  He was twelve years old.  The telegram was sent probably an hour and a half or two hours before the baby was born."  She testified, "It was about half past one in the · morning when I got downstairs.  I went up again the next morning about seven or a little after.  I inquired of her if there was anything that I could do for her, and I did whatever I could.  She was expecting a nurse in the morning.  Mr. Eaton had telephoned for the nurse· a little before eight in the morning.  In the afternoon, I went up there every half hour.  Every twenty minutes or thereabouts, I was up and down.  I asked Mrs. Bernstein when I went up· if there was anything I could do.  She made no complaint and did not ask me to do anything.  Said nothing about the children being hungry.  I sent my boy up to see if there was anything she needed.  He stayed there and tried to keep the children quiet.  She didn't ask me when I was there to sweep the floor.  I did· what was necessary.  I took care of everything."

This testimony of Mrs. Eaton is not contradicted by Mrs. Bernstein, except in her cross-examination she said, "On the morning of the 19th, there was no one came up until about ten o'clock," and further, on direct examination, "In the afternoon, Mrs. Eaton came up and sat with me, but I was there most of the time alone, she couldn't do much, she had a little baby herself, and didn't have much time."  She nowhere says that she ever requested Mrs. Eaton to assist her, or that Mrs. Eaton ever refused to render her service when requested.  She further testified on direct examination, "The children had been there all day, and towards evening the room got in such a terrible condition I could not stand it, and I got up and swept it; then I got a pan of water and washed the children's faces and hands and put them to bed."  She says that this act caused a hemorrhage.

She further testified: "The nurse came in the afternoon but didn't do anything for me that afternoon.  I swept the floor after the nurse came there.  She stayed only ·a few

minutes. I didn't ask her to stay longer. I didn't ask her to come in the evening.''

This much of the testimony we have set out as material to a proper understanding of the questions raised on this trial and disposed of in this opinion. We have attempted to set out no testimony concerning which there is any controversy in this record, except as indicated herein.

Much controversy has arisen as to whether an action of this kind is based on contract or tort—whether it is *ex contractu* or *ex delicto*. We think that, under the decisions of this court, the action may be based upon a violation of the contractual duty which a telegraph company owes to the sender of the message, or it may be based upon the general legal duty that all companies of this kind owe to the public in their dealings with the public.

1. TELEGRAPHS AND TELEPHONES : failure to deliver message : damages : nature of action : contract or tort.

The action may sound in contract or it may sound in tort. The party may waive the breach of contract and sue for damages based upon the legal wrong—the tort involved in the act. Actionable negligence is always based on a violation of some duty, whether that duty arises from contractual relationships existing between the parties, or whether the duty is imposed upon the wrongdoers by the law itself.

An examination of the pleadings in this case satisfies us that the action sounds in tort; that recovery is sought for the negligent and careless discharge of a legal duty which the defendant owed upon the receipt of the telegram for transmission. The plaintiff alleges that the defendant was guilty of gross and excessive carelessness and negligence in failing, as it did, to forward the telegram to the party to whom it was addressed. Therefore,

2. TELEGRAPHS AND TELEPHONES : failure to deliver message : nature of action : negligence : tort : pleading.

in the consideration of this case, the rules which have been well established, governing the rights of parties in suits based upon actionable negligence, will be applied, and will control the determination of this case.

It has been established by a long line of decisions that mental pain and suffering, shown to be the proximate result of a failure to deliver a telegram, is an element of damage for which recovery can be had. See *Mentzer v. Telegraph Co.*, 93 Iowa 752, which has been followed in this court consistently, though not allowed in many of the other states of the Union.

It is claimed, however, that the plaintiff in this action was allowed to recover damages which were not the proximate result of the negligence of the defendant in failing to deliver the telegram, and this is the first assignment

3. Damages: *ex contractu: ex delicto:* distinction: contemplated damages: proximate results: telegraphs and telephones.

of error, and alleges: (1) That the delay in forwarding the message was not the proximate cause of the injuries complained of. (2) That the injuries complained of were not within the contemplation of the parties when defendant undertook to forward the message. (3) That there was no mental anguish shown for which damages can be allowed.

Upon these assignments, we have to say that where the action is founded on tort, it is not necessary that it should appear that the damages sustained were such as were reasonably within the contemplation of the parties at the time the defendant undertook to forward the message. That would be true in the absence of the statute if the action rested upon a breach of contract only. In actions founded upon a breach of contract only, the plaintiff is entitled to such damages as are shown to be the proximate result of the breach, and only such as may reasonably be supposed to have been in contemplation of both parties at the time they made the contract, as a probable result of its breach, but this is not the rule in actions founded upon tort. In actions on tort, the compensation allowed is not only for such injurious consequences as proceed immediately from the cause, which is the basis of the action, but consequential damages as well, whether they be or be not in contemplation of the parties at the time the contract is made. But in either case, the damages to be recovered must be traceable directly, without any intervening

independent cause, to the original cause alleged as the basis for the damages. That is, so far as the damages are compensatory, the act complained of must be the proximate cause of the injury out of which the damage arises. As stated in the books, in actions of tort the party complaining can recover for all the injurious results which flow therefrom, by ordinary natural sequence, without the interposition of any other negligent act or overpowering force.

It is true that Sec. 2163 of the Code provides: "The proprietor of a telegraph . . . line is liable for all mistakes in transmitting or receiving messages made by any person in his employment, or for any unreasonable delay in their transmission or delivery, and for all damages resulting from failure to perform the foregoing, or any other duty required by law, the provisions of any contract to the contrary notwithstanding."

In saying that the company is liable *for all damages* resulting from a failure to deliver a message, it is evident the legislature did not intend to make the company liable for other damage than that of which the failure was the proximate cause, either direct or consequential. This holding is not inconsistent with *Barker v. Western Union Tel. Co.,* 114 N. W. 439 (Wis.).

This Wisconsin statute, construed in *Barker v. Western Union Tel. Co., supra,* is substantially the same as our statute. The decision in the *Barker* case is simply a following of the pronouncement of that court in the case of *Fisher* against the same company, 119 Wis. 146, reported in 96 N. W. 545. The *Fisher* case follows the case of *Cutts* against the same company in 71 Wis. 46. Under the construction placed upon this statute by these Wisconsin cases, it is held: "It is only necessary, as to any particular result, that it shall have been a natural consequence of the injury, having regard to the usual course of nature and of cause and effect in line of unbroken physical causation," thus making applicable to all cases of this kind the rule hereinbefore stated governing

actions in tort, and relieving the plaintiff from showing (whether the action be founded on contract or tort) that the loss was in contemplation of the parties at the time the contract was made. The construction placed upon this statute does not relieve the plaintiff of the burden of showing that the injurious consequences, following the failure to deliver the telegram, proceeded directly or as a natural consequence from such failure. Nor does it relieve the plaintiff from the burden of showing that the damages sought to be recovered are traceable directly, without any intervening independent cause, to the original cause alleged as a basis for the damages.

In *Fisher v. Western Union, supra,* the court quoted with approval from *Summerfield v. Western Union Telegraph Co.,* 87 Wis., page 1, as follows: "We cannot regard the statute as creating, or intending to create, in any way, new elements of damage. . . . Had a radical change in the law relating to the kind of suffering which should furnish a ground for damages been contemplated, the act would have expressed that intent in some unmistakable way." The court further said: "The point involved there, (that is, in the *Summerfield* case), was, whether loss attributable to injured feelings only was recoverable. The decision was based upon the doctrine that all injuries causing measurable damage, having some proximate relation to the injury, can be recovered; that in the absence of any physical injury, by common law rules, there is no such proximate relation, and the legislature did not intend by the statute to displace that doctrine. We see no reason for departing from that view. Where there is a proximate relation in the common law sense, between an injury caused by a failure of duty on the part of the telegraph company in the cases mentioned in the statute, and the injurious results, if there be such, the party is entitled to recover compensation for such results under the statute, whether the form of action be on contract, or for a breach of duty constituting actionable negligence."

So far as damage is concerned, the only difference between

an action for a breach of contract and an action resting in tort is, that in actions for a breach of contract, the damages recoverable must have been reasonably within the contemplation of the parties. In actions in tort it is not necessary that this element should exist. But in either case, the damages recoverable must be the natural and probable consequence of the conduct of the wrongdoer. The conduct complained of, and the consequences which follow, resulting in damages, must be connected directly or by an unbroken chain of successive events, each dependent upon the other. Or, in other words, where an actionable injury has been suffered, it is only necessary in actions in tort that the consequences, the results, shall be a natural consequence of the injury, having regard, as hereinbefore said, to the usual course of nature in matters of that kind, and of cause and effect, in a line of unbroken physical causation. This makes the proximate relation between damage and injury. But, however, in considering all these questions, we must distinguish between the result, as it has relationship to the injury, and the result as applied to the proximate consequences of the injury.

In the case at bar, therefore, following the rules hereinbefore stated, and recognizing and giving force and effect to the statute hereinbefore noted, we hold that the plaintiff is liable, in this case, for all damages which resulted from the failure to perform its legal duty; for all damages flowing from said wrong, both direct and consequential, but for only such injury or damage as the failure of the defendant to discharge this duty is shown to have been the proximate cause, whether it was apprised of the nature or importance of the telegram or not, and though the damages may not have been in contemplation of the parties at the time the message was delivered for transmission.

This holding disposes of much of the argument made in this case, and dispenses with the consideration of those cases in which it was held that the action was based on breach of contract.

This statute, no doubt, was enacted for the purpose of relieving from the embarrassment and difficulty, which existed under our form of pleading, in determining whether the action was based on contract or on tort, and for the purpose of fixing the same rule of damage in either case.

We proceed now to determine whether or not, under this record, any of the damage which plaintiff claims to have suffered is shown to have been the proximate result of the negligence of the defendant in failing to transmit the message promptly and without unreasonable delay; whether there was or was not some independent, intervening cause which broke the continuity of causation between the act complained of and the injury suffered.

We find in this record evidence from which the jury might well have found that if the defendant had transmitted the message as was its duty to do, the plaintiff could have arrived and been with his wife shortly after seven o'clock on the morning of the 19th; that he did not receive the message, and, therefore, did not arrive. That he did not arrive was known to his wife shortly after seven o'clock. She could not then know whether he had received the message or not. Assuming that relationship existed between these parties such as ordinarily exists between husband and wife, she had reason to believe that he had not received the message, for the message itself requested an answer. She did know, however, the fact that he did not respond to the message, even though she did not know the reason. It appears that about ten o'clock she called the little boy, twelve years old, who resided with his parents in the basement of the building occupied by her, and sent him on an errand for food. Conceding that her effort to procure the service of this boy, as testified to by her, was made necessary by the failure of her husband to arrive at seven o'clock, and assuming that she sustained some injury by reason of this effort, yet it appears that on this same day, the 19th, the washerwoman arrived about noon, changed her bed clothing, took the soiled clothing from the room, and remained

there until about one o'clock; that in the afternoon Mrs. Eaton came up and sat with her; that the nurse came about four o'clock of the same day; that after this, and after an opportunity to secure the services of these people had passed, and without requesting their services, although Mrs. Eaton says she was willing to serve her, and offered services—and this is not denied by the plaintiff—and after she had experienced the effect of rising on her feet in the morning at the time she called the boy to get food for the children, she got up and swept the floor, got a pan of water and washed the children's faces and hands and put them to bed.

This apparently was a voluntary act on her part, an unnecessary act in view of the situation. This is an act which she claims produced serious injury to her, and this is the injury for which, in part, she was allowed to recover in this action.

We think there was an independent, intervening cause for this injury, breaking the continuity of the chain of causation between the alleged wrong, on the part of the defendant, and the injury sustained. If we take the undisputed record in this case, this act of hers was done whimsically or through caprice. It is no more chargeable to the negligent act of the defendant than if she had, while in her right mind, under the same circumstances, and with the same environment, severed her right hand from her wrist. The act of rising from her bed, while in her then condition, and doing this work, knowing from experience the consequences that must follow, was her own voluntary act, without reason or cause for the doing, and the resultant injury was directly traceable thereto. The failure of the defendant to send the telegram to her husband cannot be the proximate cause of this injury, if any.

Again, the plaintiff was allowed to recover for permanent injuries based upon the fact that there was a permanent displacement of the womb, traceable directly, or as a natural consequence, to the failure of the defendant to send the telegram to her husband.

She testifies that she arose from her bed and went about her ordinary household work and caring for three children, on or before the 25th day of July. It appears that her husband left for Cedar Rapids on the 25th, and she said she was up and about when he left; was doing her own work and had discharged the nurse as unnecessary; that thereafter and about the 1st of August, she traveled in company with these three children, without anyone to assist her, from Chicago to Cedar Rapids. It does not appear that she received any treatment for any ailment after reaching Cedar Rapids at any time. She claims that she first discovered the trouble in the region of her womb about two months after she reached Cedar Rapids. When she was first on the stand, as a witness for herself, she did not testify to any trouble with her womb or internal organs except such as she experienced the day following the birth of the child.

It appears that, on the trial of this cause, a doctor was called for the plaintiff who, when sworn for examination, testified: "I examined Mrs. Bernstein yesterday. She came to my office and I asked her questions." After the doctor had left the stand, Mrs. Bernstein was recalled for a further examination by the plaintiff, and was asked this question: "Now, how soon, Mrs. Bernstein, after you came to Cedar Rapids and after you left Chicago, was it that you commenced to feel ailments with reference to and in the region of your womb and internal organs?" She answered, "About two months after."

The doctor in his testimony stated that his examination showed a displacement of the womb. The doctor's examination of Mrs. Bernstein was made about the time of the trial. The trial was commenced on the 8th day of May, 1912.

We have set out the substance of the doctor's testimony, and in that testimony the doctor stated on cross-examination: "The average time for a woman to stay in bed after confinement is from ten days to two weeks. If they get up earlier than ten days after the birth, it is liable to be injurious to

the average woman, I think that is the regular practice and the regular advice of physicians.'' The doctor further stated that in view of the conduct of Mrs. Bernstein as detailed by her, he was unable to say how much of her present condition was due to what she did immediately after the baby was born, and what she did after the baby was eight days old; that if she got up and stayed up after the baby was eight days old, and took a trip with three children to Cedar Rapids without any help, that would have an effect on her system. ''I think it would be a factor.''

While Mrs. Bernstein states that she did not get up until after the baby was eight days old, the record shows that she was up at the time her husband left, and her husband left on the evening of the 25th, which would be less than seven days from the time of the birth.

Upon this record the court submitted the question to the jury, as to whether or not Mrs. Bernstein had not only received injuries as a proximate result of the defendant's negligence in sending the telegram, but whether or not these injuries were permanent, and the permanency traceable directly to the wrongful act of the defendant. The court submitted this question in its seventh instruction in the following language: ''You are further instructed that if you find that by reason of defendant's negligence, plaintiff's wife was compelled to get out of bed, and the getting out of bed injured her permanently, then in that event, you should allow her such further sum as you deem will compensate for such pain and suffering as it is reasonably certain she will endure in the future.''

4. DAMAGES:
avoidable consequences:
torts: telegraphs and telephones:
failure to deliver message:
damages to health.

In the preceding instruction the court said: ''Evidence has been given regarding Mrs. Bernstein's getting out of bed, and you are instructed regarding that feature of the case, that if Mrs. Bernstein was required to leave her bed the day following the birth of her child, and that she was injured in so doing, and you find that in all probability plaintiff would

have reached his wife before she was compelled to get out of bed and relieved her from the necessity of getting up, if the message had been delivered in a reasonable time, then you would be warranted in finding that defendant's negligence caused such injury.''

These instructions are vague and indefinite. The words ''necessary'' and ''compelled'' are not limited in any way in dealing with the conduct of Mrs. Bernstein. The court, however, said, ''You will be confined in your consideration to such acts of plaintiff's wife which were necessary by her husband's absence.'' Nowhere in the instructions were the jury told that any duty rested upon Mrs. Bernstein to exercise any care to protect herself from injury, or to lessen the damages which might follow from her want of such care, and to sum it all up the court said, ''But if you fail to find by a preponderance of the evidence that, in all probability, the injury was by reason of her getting up the day after the birth of her child, (referring to the permanent injury), or if you find that the present condition of her womb might be caused, with as much certainty, by other acts or causes, then you should not attribute the present condition to the negligence of the defendant.''

With this light to guide the jury in wandering through the maze of uncertain testimony, upon the question of the permanency of Mrs. Bernstein's injuries, and whether or not the condition, if any, found by the doctor upon his examination made during the trial was due to the defendant's negligence, the jury were permitted to say that in all probability the condition of Mrs. Bernstein's womb, found nearly nine months after the birth of the child, was traceable directly, or as a natural consequence, to the defendant's failure to send the telegram on the night of July 18, 1911.

We think there is no evidence which would justify the jury in finding, with that certainty which the law requires, that the condition of Mrs. Bernstein's womb was traceable, as a direct or consequential result, to the conduct of this defendant. It is the merest speculation, the merest guess, when

based upon this record, as to what caused her condition, as found by the doctor at the time of the trial, and we think the court erred in allowing the plaintiff to amend his petition, and in submitting to the jury for its determination as a probability, whether or not the injuries suffered by Mrs. Bernstein were traceable to the defendant's action as their proximate cause. There is no foundation in the evidence for the nice balancing of probabilities. Before a thing can be said to be probably true, as a result of a negligent act, it must appear that, in the natural course of nature, without any intervening, moving cause, the result usually and ordinarily does happen in the course of nature from such cause.

There are other matters complained of by the defendant on its appeal, but as they are either covered by what has been here said, or are such as will not arise on another trial, we do not give them consideration.

We hold that the court erred in allowing the jury to consider any physical injuries which Mrs. Bernstein sustained on the afternoon of July 19th, and in submitting to the jury, as a basis for recovery, the injury, if any, sustained by her, predicated upon her own conduct, under the circumstances, in arising from her bed on the afternoon of July 19th and in submitting to the jury, as a basis for recovery, as a probability, that Mrs. Bernstein's present condition is traceable directly to the defendant's act as its probable cause.

For the errors pointed out, the case is—*Reversed.*

Deemer, C. J., Ladd and Salinger, JJ., concur.